IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

TINA K.,[1]
    Plaintiff,

        v.                                              Civil No. 3:20-cv-00455 (MHL)

KILOLO KIJAKAZI,[2]
    Defendant.

## REPORT AND RECOMMENDATION

This is an action seeking review of the decision of the Commissioner of Social Security ("Commissioner") denying the application of Tina K. ("Plaintiff") for disability insurance benefits under the Social Security Act (the "Act"). Plaintiff previously worked as an insert operator, night cleaner, and mail sorter. (R. at 105-108, 222, 229-237.) Plaintiff claims that she is disabled because she suffers from: (1) panic attacks; (2) a left leg injury; (3) bilateral arthritis in her knees; (4) anxiety; and (5) extreme limitations in maintaining concentration, persistence, and pace. (R. at 221, 239, 261, 325, 555.) The Administrative Law Judge ("ALJ") found Plaintiff has the following severe impairments: (1) traumatic arthropathy of the right ankle and foot; (2) osteoarthritis; (3) hypothyroidism; (4) obesity; and (5) carpal tunnel syndrome. (R. at 78.)

On April 22, 2017, Plaintiff filed an application for disability insurance benefits and supplemental security income. (R. at 76.) Plaintiff's application was denied, and she subsequently

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

[2] On July 9, 2021, Kilolo Kijakazi became the Acting Commissioner of Social Security. Pursuant to Federal Rules of Civil Procedure Rule 25(d), Acting Commissioner Kijakazi should be substituted as the defendant in this suit.

1

exhausted her administrative remedies. Plaintiff now seeks judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g). (R. at 1, 88.)

This matter comes before the Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) on cross-motions for summary judgment, rendering the matter ripe for review.[3] Plaintiff raises two arguments, asserting that: (1) the ALJ improperly classified Plaintiff's mental health impairments as non-severe; and (2) the ALJ's assessment of residual functional capacity is inconsistent with the ALJ's evaluation of the opinion evidence. (Pl.'s Br. Supp. Mot. Summ. J. at 4, ECF No. 26 ("Pl.'s Mem.") at 8, 13.) For the reasons that follow, the Court recommends that Plaintiff's Motion for Summary Judgment (ECF No. 25) be DENIED, Defendant's Motion for Summary Judgment (ECF No. 27) be GRANTED, and the final decision of the Commissioner be AFFIRMED.

## I. PROCEDURAL HISTORY

On April 22, 2017, Plaintiff filed an application for disability insurance benefits, alleging a disability onset date of March 26, 2018. (R. at 76, 217.) The Social Security Administration denied Plaintiff's claim on October 11, 2017, and again upon reconsideration on May 16, 2018. (R. at 76.) At Plaintiff's request, the ALJ held a hearing on April 3, 2019 (the "Hearing") at which Plaintiff and a vocational expert testified. (R. at 76.) Plaintiff was represented by counsel at the Hearing. (R. at 76.) On May 9, 2019, the ALJ issued a written opinion denying Plaintiff's disability claim. (R. at 88.) The ALJ concluded that Plaintiff did not qualify as disabled because Plaintiff is

---

[3] The administrative record in this case remains filed under seal, pursuant to E.D. Va. Loc. R. 5 and 7(C). In accordance with these Rules, the Court will endeavor to exclude any personal identifiers such as Plaintiff's social security number, the names of any minor children, dates of birth (except for year of birth), and any financial account numbers from its consideration of Plaintiff's arguments, and will further restrict its discussion of Plaintiff's medical information to only the extent necessary to properly analyze the case.

capable of performing past relevant work as it is generally performed in the national economy. (R. at 86-88.) The Social Security Administration Appeals Council subsequently denied Plaintiff's request for review of the ALJ's decision, rendering the ALJ's decision as the final decision of the Commissioner subject to review by this Court. (R. at 1.) Plaintiff now seeks judicial review pursuant to 42 U.S.C. § 405(g).

## II. STANDARD OF REVIEW

This Court upholds an ALJ's Social Security disability determination if: (1) the ALJ applied the correct legal standards; and (2) substantial evidence supports the ALJ's factual findings. *See Arakas v. Comm'r, Soc. Sec. Admin.*, 983 F.3d 83, 94 (4th Cir. 2020) (citing 42 U.S.C. § 405(g) and *Pearson v. Colvin*, 810 F.3d 204, 207 (4th Cir. 2015)).

"Substantial evidence is that which a reasonable mind might accept as adequate to support a conclusion." *Pearson*, 810 F.3d at 207 (internal quotation marks omitted). Substantial evidence thus requires more than a scintilla of evidence, but less than a preponderance of the evidence. *See Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Between these two evidentiary thresholds lies a "zone of choice" where the ALJ's decision can go either way without interference by the courts. *See Dunn v. Colvin*, 607 F. App'x. 264, 274 (4th Cir. 2015) (quoting *Clarke v. Bowen*, 843 F.2d 271, 272–73 (8th Cir. 1988)). "'In reviewing for substantial evidence, we do not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute our judgment' for the ALJ's." *Arakas*, 983 F.3d at 95 (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)).

A necessary predicate to engaging in substantial evidence review is a record of the basis for the ALJ's ruling. *See Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir. 1984). The record should include a discussion of which evidence the ALJ found credible and why, and specific application of the pertinent legal requirements to the record evidence. *See Hines v. Bowen*, 872

3

F.2d 56, 59 (4th Cir. 1989). If the reviewing court has no way of evaluating the basis for the ALJ's decision, then "the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 744, 105 S. Ct. 1598, 84 L. Ed. 2d 643 (1985).

### III. FACTUAL BACKGROUND

The ALJ considered Plaintiff's background, medical evidence, and testimony when deciding to deny Plaintiff's disability claim.

**A. Plaintiff's Background.**

Plaintiff was forty-nine years old at the time of her benefits application. (R. at 76, 218.) She is a high school graduate and previously worked as a mail sorter. (R. at 76, 105-108, 222, 229-237.) The transferability of Plaintiff's skills is not at issue because Plaintiff's past relevant work was unskilled. (R. at 87.) She has been unemployed since October 2016, and states that she is limited in her ability to work because of her anxiety and inability to stand and sit for a long time due to pain and anxiety. (R. at 105-109.)

**B. Medical Evidence.**

Plaintiff's medical record indicates that she suffered injuries in a motor vehicle collision in 2007. (R. at 536.) She explained that she was driving her car, hit an ice patch, and struck another vehicle head-on. (R. at 536.) Subsequently, Plaintiff was hospitalized for four days and underwent surgery to implant an internal medullary rod in her left humeral bone. (R. at 536-37.) The record also indicates that she had a broken femur surgery in 2007 and gastric bypass in 2009. (R. at 537.)

On December 1, 2014, Plaintiff fell down steps and subsequently sought medical treatment from her family physician, Dr. Andrea Crawford. (R. at 331.) After the fall, Plaintiff reported soreness and pain, in particular to her left knee. (R. at 331.) This pain worsened when walking or

bending the knee, but there was no numbness or tingling. (R. at 331.) Dr. Crawford examined her knee, which indicated a positive McMurray Test (pain or clicks when the knee is manipulated). (R. at 332.) Dr. Crawford diagnosed Plaintiff with a knee sprain, and Plaintiff refused further testing. (R. at 332.) Dr. Crawford advised Plaintiff to follow up with her in a week if her pain persisted. (R. at 332.) Plaintiff returned to Dr. Crawford on February 9, 2015, complaining of chest congestion, sinus pressure in her head and ears, and a cough. (R. at 334.) Dr. Crawford examined and assessed Plaintiff with a viral syndrome. (R. at 336.)

Plaintiff followed up with Dr. Crawford on December 26, 2015, complaining of joint pain in her hands and wrists. (R. at 338.) She reported the presence of numbness, tingling, and burning sensations in both hands for about a month. (R. at 338.) Dr. Crawford assessed Plaintiff and determined that she had bilateral carpal tunnel syndrome. (R. at 339.) She advised Plaintiff to wear wrist braces and take non-steroidal anti-inflammatory drugs for one week. (R. at 339.)

Plaintiff returned to Dr. Crawford's office on April 20, 2016, and reported right foot pain after falling four days before. (R. at 341.) Medical imaging revealed traumatic arthropathy of the right ankle and foot as well as a fractured right toe. (R. at 342, 345.) Dr. Crawford diagnosed Plaintiff with a crushed right foot injury, supplied her with a walking shoe, and referred her to an orthopedist. (R. at 342.)

On June 9, 2016, Plaintiff returned, again, with left knee pain, reporting that she twisted it while bathing her toddler. (R. at 343.) Imaging showed a fractured retained femoral hardware with suspected associated downward propulsion of a femoral intramedullary rod, tricompartmental osteoarthritis, and quadriceps enthesopathy. (R. at 346.) Dr. Crawford diagnosed her with left knee joint pain and prescribed her with pain medication (R. at 344.) She referred Plaintiff to a specialist to evaluate Plaintiff's left knee. (R. at 344.)

Plaintiff received orthopedic treatment on June 14, 2016, at Orthopedic Specialty Clinic. (R. at 350.) At her appointment, Plaintiff relayed a history of a left femur fracture that had not been an issue for the prior seven or eight years, but an increase in pain in her right knee. (R. at 354.) She reported pain when flexing and extending it, and when she goes up and down stairs. (R. at 354.) On examination, her knee showed crepitus with flexion-extension and tenderness at the patella tendon. (R. at 354.) A series of x-rays showed that the femur fracture healed well with the retained hardware and screws. (R. at 354-355.) Plaintiff was diagnosed with left knee pain, treated for arthritis, and prescribed anti-inflammatory medication. (R. at 354-355.)

A month later, on July 7, 2016, Plaintiff followed up with her orthopedist and reported 70% improvement in her symptoms, including going up and down stairs without pain. (R. at 352.) On examination, Plaintiff's knees appeared stable and did not cause reproducible pain or tenderness. (R. at 352.) The doctor found that she had full strength and full range of movement. (R. at 352.)

Plaintiff has a documented history of anxiety and hypothyroidism. She began treating at Mary Washington Healthcare for primary care on March 12, 2013, and reported complications with her hypothyroidism as well as sadness, grief, and anxiety following her father's death by suicide one month earlier. (R. at 407, 413.) She continued to treat for hypothyroidism and anxiety in 2013, 2014, 2015, and 2017. (R. at 361, 373, 390, 404, 407, 413.) At her March 6, 2017 appointment, Plaintiff reported a gradual onset of anxiety, excessive worry, and difficulty concentrating due to recent weight gain. (R. at 361.) She was advised to resume her medications, exercise more frequently, and to follow up for further evaluation. (R. at 363-364.)

Plaintiff began seeing a mental health therapist on September 17, 2013, for panic attacks, depression, and anxiety. (R. at 469-470.) She reported an increase in anxiety since her father's passing, which impacted her ability to function at work. (R. at 494.) She continued treating with

her therapist until September 30, 2015, when she reported continued anxiety, but no major panic attacks. (R. at 477.)

On September 30, 2017, Plaintiff sought treatment at the Virginia Department of Rehabilitative Services, complaining of pain to both knees and in her lower left extremity. (R. at 536.) The records indicate that she walked with an antalgic gait with preference to her right lower extremity but was otherwise able to sit comfortably upright without difficulty. (R. at 538-539.) She demonstrated 4/5 strength in her lower extremities, including hip flexion, knee flexion, knee extension, and ankle dorsiflexion. (R. at 539.) Plaintiff could stand for two hours, walk for one hour, and sit for six hours. (R. at 539.)

At the request of the Social Security Administration, Dr. Faye Romano examined Plaintiff on April 23, 2018. (R. at 552.) Dr. Romano determined that Plaintiff suffered from a panic disorder, generalized anxiety, and a history of depression. (R. at 555.) She noted that Plaintiff did not exhibit difficulty with memory, reasoning, fund of knowledge, and exhibited overall proficiency in answering questions regarding simple, abstract reasoning. (R. at 555.) Dr. Romano noted that Plaintiff's ability to maintain regular attendance in the workplace, perform work activities on a consistent basis, and complete a normal workday or work week without interruption appeared to be relatively unimpaired, with only her ability to interact with others being mildly compromised. (R. at 555-556.)

At the request of the Social Security Administration, Plaintiff then met with Dr. David Lapides on April 28, 2018. (R. at 559-564.) Dr. Lapides determined that Plaintiff had normal extension and flexion of her left and right knees, and normal range of movement for all tested areas. (R. at 563.) Dr. Lapides opined that Plaintiff could "be expected to sit and stand normally in an 8-hour workday with normal breaks." (R. at 564.) Additionally, he determined that Plaintiff

did not need an assistive device or have significant limitations with lifting or carrying weight. (R. at 564.) However, Dr. Lapides determined that Plaintiff would be limited in crouching and squatting due to her knee pain and obesity. (R. at 564.)

### C. Plaintiff's Testimony.

Plaintiff testified that she is unable to work due to her inability to sit or stand for too long a time. (R. at 108.) She testified that she cannot sit or stand longer than ten minutes due to knee pain. (R. at 109.) Further, she testified to having difficulty with her memory, maintaining attention and concentration, understanding information or instructions, making decisions, and interacting with others. (R. at 112.)

Plaintiff testified that her typical day consisted of getting her nephew ready for school, seeing her husband and sister off to work, and doing dishes and laundry. (R. at 112.) She denied being able to do yard work or "spring cleaning." (R. at 113.) While she was able to go to the grocery store twice a week, her husband does about eighty percent of the shopping. (R. at 115.) She testified that she must "sit in segments" and sets a ten-minute timer on her microwave to alert her to stand up. (R. at 112-13.) Plaintiff told the ALJ that her home is a split-level structure, which involves going upstairs and downstairs frequently. (R. at 116-117.) Plaintiff elevates her legs "[a]fter every activity" due to the pain and swelling in her knees that occurs after going up and down stairs. (R. at 117.) Plaintiff spoke about her anxiety and history of panic attacks. (R. at 117-118.) She relayed feeling suffocated and afraid when around people, which interferes with her ability to socialize and feel comfortable around others. (R. at 118.)

### D. Vocational Expert's Testimony.

The ALJ examined a vocational expert at the hearing. (R. at 118.) The vocational expert read and listened to Plaintiff's testimony regarding her work history. (R. at 119.) She discussed

Plaintiff's previous employment and the exertional levels of some of the positions. (R. at 120-121.) The ALJ then questioned the vocational expert regarding hypothetical situations of a person with the same age, education, and limited exertion and duration of continuous work levels. (R. at 121-124.) The vocational expert testified that Plaintiff would be able to continue working as a mail clerk, as generally performed. (R. at 121.) She also discussed available jobs in the national economy for a hypothetical worker with Plaintiff's limitations, age, and education. (R. at 121-124.) The vocational expert testified that a hypothetical person matching Plaintiff's limitations, age, and education would not be able to find available work in substantial numbers in the national economy if the individual would be able only to do light work and have no public contact. (R. at 122-123.)

## IV. THE ALJ'S DECISION

Following the hearing, the ALJ issued a written opinion on May 9, 2019. (R. at 76-88.) In his ruling, the ALJ concluded that Plaintiff did not qualify as disabled and denied her application for benefits. (R. at 88.) The ALJ followed the five-step evaluation process established by the Act to determine whether a disability exists. (R. 76-88.); 20 C.F.R. § 404.1520(a)(4); *see Mascio v. Colvin*, 780 F.3d 632, 634-35 (4th Cir. 2015) (describing the five-step sequential evaluation).

According to those regulations, at step one, the ALJ looks at the claimant's current work activity. § 404.1520(a)(4)(i). At step two, the ALJ asks whether the claimant's medical impairments meet the regulations' severity and duration requirements. § 404.1520(a)(4)(ii). At step three, the ALJ determines whether the claimant's medical impairments meet or equal an impairment in the Listings.[4] § 404.1520(a)(4)(iii); *see* 20 C.F.R Pt. 404, Subpt. P, App. 1. Between

---

[4] The Listings are a regulatory appendix of "the major body systems impairments that [the Social Security Administration] consider[s] to be severe enough to prevent an individual from doing any gainful activity." § 404.1525 (a).

9

steps three and four, the ALJ must assess the claimant's residual functional capacity, accounting for the most that the claimant can do despite her physical and mental limitations. §§ 404.1520(e), 404.1545(a)(1). At step four, the ALJ assesses whether the claimant can perform her past work given her residual functional capacity. § 404.1520(a)(4)(iv). Finally, at step five, the ALJ determines whether the claimant can perform any work existing in the national economy. § 404.1520(a)(4)(v).

## V. ANALYSIS

The ALJ found at step one that Plaintiff had not engaged in substantial gainful activity since March 26, 2018, the amended alleged onset of her disability. (R. at 78.) At step two, the ALJ found that Plaintiff has severe impairments of traumatic arthropathy of the right ankle and right foot, osteoarthritis, hypothyroidism, obesity, and carpal tunnel syndrome. (R. at 78.) The ALJ found that these severe impairments significantly limit Plaintiff's ability to perform basic work activities. (R. at 78.) At step three, the ALJ determined that these impairments did not meet or medically equal the severity of any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1, as required for the award of benefits at that stage. (R. at 78-80.) Specifically, the ALJ held that Plaintiff's impairments did not meet or equal Listings 1.02, 14.09, 4.00, 5.00, 9.00, 11.00, and 12.00. (R at 80-81.) In concluding Plaintiff's impairments did not meet any disability listing, the ALJ explained that Plaintiff:

> has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except that she can stand and/or walk for a total of four hours. The claimant can frequently climb ramps and stairs. She can occasionally climb ladders, ropes, or scaffolds. The claimant can frequently stoop, kneel, crouch, and crawl.

(R. at 81.)

At step four, the ALJ concluded that Plaintiff is able to perform past relevant work as a mail clerk because her residual functional capacity does not preclude her from performing activities related to that type of work. (R. at 86.) In particular, the ALJ found that Plaintiff had the residual functional capacity to perform light work, except she can frequently use ramps or stairs, she can occasionally be required to use ladders, ropes or scaffolds, but she can frequently stoop, kneel, crouch, and crawl. (R. at 81.)

Because the ALJ determined that Plaintiff was capable of performing her past relevant work, it was unnecessary to pursue the analysis to step five in which the Commissioner would have had the burden to show that, considering the claimant's age, education, work experience, and residual functional capacity, the claimant was capable of performing other work that is available in significant numbers in the national economy. 20 C.F.R. §§ 416.920(f); 404.1520(f); *Powers*, 207 F.3d at 436 (citing *Yuckert*, 482 U.S. at 146 n.5 (1987)). At step five, the ALJ determined that Plaintiff's past relevant work was unskilled under 20 CFR 404.1568. (R. at 87.) The ALJ agreed with the vocational expert's testimony that Plaintiff has the skills to work in jobs that are classified as light exertional level with additional limitations, which are found in the national economy. (R. at 87.)

The ALJ made this determination after reviewing the record, hearing the vocational expert's testimony, and considering the information contained in the Dictionary of Occupational Titles. (R. at 87.) Accordingly, the ALJ concluded that Plaintiff was not disabled as defined by the Act. (R. at 88.)

Plaintiff moves this Court to review the Commissioner's decision to deny her application for benefits, or, in the alternative, to remand the claim for further proceedings. (Pl.'s Mem. at 15). In support, Plaintiff argues that: (1) the ALJ improperly classified Plaintiff's mental health

impairments as non-severe; and (2) the ALJ's assessment of residual functional capacity is inconsistent with the ALJ's own evaluation of the opinion evidence. (Pl.'s Mem. at 8, 13). Defendant argues that the ALJ's decision should be affirmed because: (1) it is supported by substantial evidence; and (2) there was no conflict between Dr. Lapides' opinion and the assessment of residual functional capacity. (Def.'s Mot. Summ. J. Br. Sup. ("Def.'s Mem.") at 11, 18).

### A. Substantial evidence supports the ALJ's assessment that Plaintiff did not have a severe mental health impairment.

Plaintiff argues that the ALJ erred in classifying Plaintiff's mental health impairments as non-severe which resulted in an inaccurate residual functional capacity. (Pl.'s Mem. at 8.) Plaintiff contends that "all three sources of mental health opinions, the state agency reviewing psychologist, examining mental health expert, and treating psychiatrist all believe that [Plaintiff] suffers from a severe mental health impairment." (Pl.'s Mem. at 13.) Plaintiff argues that the "ALJ's decision to find otherwise, especially when there is such a low threshold, is inconsistent with the evidence of the record." (Pl.'s Mem. at 13).

Defendant asserts that the ALJ evaluated Plaintiff's mental impairments in accordance with controlling agency regulations. (Def.'s Mem. at 11.) Defendant supports the ALJ's finding that Plaintiff "failed to establish that her medically determinable mental impairments of depression, bipolar disorder, anxiety, panic disorder, eating disorder, and posttraumatic stress disorder were severe because they caused no more than 'mild' limitations in the four broad functional areas." (Def.'s Mem. at 11).

The Court finds that there is substantial evidence to support the ALJ's determination that Plaintiff's mental impairments were non-severe. The ALJ outlined the four broad areas of mental functioning and examined Plaintiff's record. (R. at 79-80.) First, the ALJ examined Plaintiff's

12

understanding, memory, and ability to apply information. (R. at 79.) Other than some mentions of memory issues in the record, the ALJ noted that Plaintiff has mostly normal, objective findings without signs of a memory deficit. (R. at 79.)

Second, the ALJ examined Plaintiff's ability to interact with others. (R. at 79.) She found that Plaintiff had only a mild limitation because the record notes throughout Plaintiff's pleasant and cooperative demeanor as well as her regular interactions with the public and her family. (R. at 79.)

Third, the ALJ determined that Plaintiff was mildly limited in concentrating, persistence, and maintaining pace. (R. at 79.) In support of her finding, the ALJ noted that the record indicated how Plaintiff evidenced mostly normal, objective findings, and had no signs of attention or concentration defects. (R. at 79.) Additionally, the ALJ noted that Plaintiff testified that she could drive, watch television, care for her nephew, clean, care for herself, and shop. (R. at 80.)

Fourth, the ALJ determined that Plaintiff was not limited in adapting or managing herself because she indicated that she could cook, clean, shop, pay bills, drive, and care for family members. (R. at 80.) Additionally, Plaintiff was noted throughout the record as being alert, cooperative, fully oriented, and having good eye contact, normal, speech, affect, thought process, memory, and judgment. (R. at 80.) Although the record indicated that Plaintiff exhibited anxiety, depression, and flat affect at times, the ALJ found, overall, that Plaintiff was adequately adapting and managing herself and her mental health. (R. at 80.)

> **1. Substantial evidence supports the ALJ's finding that Plaintiff had no limitation in understanding, remembering, or applying information.**

The ALJ did not err when she found that Plaintiff did not have a limitation in understanding, remembering, or applying information. While the ALJ acknowledged that the

record included some discussion of memory issues, taken as a whole, the record indicated "mostly normal objective findings with no signs of memory deficits." (R. at 79.)

When asked about her ability to remember, Plaintiff testified that she sometimes had memory problems "here and there." (R. at 111-12.) Dr. Romano's evaluation noted that Plaintiff did not exhibit difficulty with her recent, long, or short-term memory. (R. at 555.) Dr. Lapides opined that Plaintiff's memory and concentration were normal. (R. at 561.) Finally, Dr. Anwar noted that Plaintiff's memory was intact, and her thought content was appropriate. (R. at 539.) Beyond the opinions of the medical professionals, Plaintiff's daily activities indicate that her memory and understanding were intact. Plaintiff testified that she could drive, care for her nephew, clean, shop, pay bills, follow instructions, cook, and perform personal care tasks. (R. at 112-114.) While Plaintiff suffers from anxiety, there is no indication that she was ever hospitalized or received psychological treatment beyond mental health counseling. Therefore, substantial evidence within the record supports the ALJ's determination that Plaintiff had no limitation in her ability to understand, remember, or apply information.

### 2. Substantial evidence supports the ALJ's finding that Plaintiff had a mild limitation in interacting with others.

The ALJ determined that Plaintiff had a mild limitation when interacting with others based on the ALJ's examination of the record and testimony at the Hearing. Plaintiff's medical providers found her to be pleasant, cooperative, calm, and not in distress. (R. at 79, 579.) Additionally, she demonstrated that she was capable of caring for her mother and nephew. (R. at 79.) When asked how well she got along with authority figures, Plaintiff responded, "I get along with everybody." (R. at 251.) Plaintiff has stated she can go out alone, attends parties and church services, has friends, and is open to finding new friends. (R. at 248, 486, 490, 543, 554, 580.)

The record supports these findings. For instance, Dr. Romano reported that Plaintiff was "a friendly individual who maintained a friendly interaction with the examiner." (R. at 554.) Dr. Romano determined that Plaintiff could start and maintain social connections with others. (R. at 554.) However, he noted that Plaintiff's ability to work with "coworkers and the public, as well as coping with routine stressors encountered in competitive work does appear to be mildly compromised." (R. at 556.)

The record supports the ALJ's finding that Plaintiff is mildly limited in her ability to interact with others. Therefore, the ALJ's finding was not in error.

### 3. Substantial evidence supports the ALJ's finding that Plaintiff had a mild limitation in concentrating, persisting, or maintaining pace.

The ALJ examined the record and determined that Plaintiff has a mild limitation in concentrating, persisting, or maintaining pace. (R. at 79.) In her application, Plaintiff represented that her attention span was not affected. (R. at 250.) Her providers consistently noted that Plaintiff had normal orientation, attention skills, language skills, fund of knowledge, mood, and affect. (*See e.g.*, R. at 363, 367, 371.)) Plaintiff's daily activities evince a mild limitation in concentration, persistence, or maintaining pace. For instance, Plaintiff cares for herself and a minor child, cooks, shops, and drives a car. (R. at 248, 103, 113, 115, 553.) Therefore, substantial evidence supports the ALJ's finding that Plaintiff had no more than a mild limitation in concentrating, persisting, or maintaining pace.

### 4. Substantial evidence supports the ALJ's finding that Plaintiff had no limitation adapting or managing herself.

The ALJ found that Plaintiff has no limitation adapting or managing herself. (R. at 80.) Plaintiff testified that she drives a car, cleans the dishes, tends to basic housework, and cooks for herself and her family. (R. at 112-116.) Plaintiff has been found to do activities of daily living

15

Throughout the record, Plaintiff discussed how she serves as primary caregiver to her mother and nephew. (R. at 246, 553, 577, 579.) Dr. Anwar notes that Plaintiff is able to feed, bathe, dress herself, and that Plaintiff does light household chores. (R. at 537.) Therefore, there is substantial evidence in the record that supports the ALJ's finding that Plaintiff has no limitation in adapting or managing herself.

### B. The ALJ did not err when he determined Plaintiff's residual functioning capacity.

Plaintiff asserts that the ALJ erred when she determined Plaintiff's residual functioning capacity because it was inconsistent with her evaluation of the medical opinion evidence. (Pl.'s Mem. at 13). Plaintiff avers that the ALJ did not fully account for Dr. Lapides' opinion when she determined Plaintiff's residual functioning capacity. (Pl.'s Mem. at 13). Defendant argues that because Dr. Lapides did not state that Plaintiff needed to have a break from walking every hour, the ALJ's omission of that limitation in Plaintiff's residual functioning capacity was consistent with Dr. Lapides' opinion. (Def.'s Mem. at 20). Dr. Lapides opined that Plaintiff's limitations were "very minor" and that Plaintiff could walk for an hour at minimum. (Pl.'s Mem. at 20, citing R. at 564.)

The ALJ determined that Plaintiff had the residual functional capacity to "…perform light work as defined in 20 CFR 404.1567(b)[,] except she can stand and/or walk for a total of four hours. Plaintiff can frequently climb ramps and stairs. She can occasionally climb ladders, ropes, or scaffolds. Plaintiff can frequently stoop, kneel, crouch, and crawl." (R. at 81.) Light work involves:

> lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can

> do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

*See* 20 CFR 404.1567.

Light work does not limit the amount of walking or standing. However, the ALJ added the limitation of only standing and/or walking for a total of four hours in a normal workday. (R. at 81.) The limitation of walking for a total of four hours in the normal workday appears consistent with Dr. Lapides' opinion. Dr. Lapides stated that Plaintiff "can be expected to walk at least 1 hour at a time before needing a break and 4 hours total in an 8-hour workday due to knee pain." (R. at 564.) Plaintiff argues that the residual functioning capacity determination cannot be consistent because it included a temporal limitation on Plaintiff's ability to walk for over an hour. (Pl. Mem. at 20.) Yet, Dr. Lapides opined that Plaintiff could walk *at least* an hour without taking a break. (R. at 564.) This is consistent with the ALJ's determination that Plaintiff was only limited to walking a total of four hours during the workday. Thus, the ALJ did not err when determining Plaintiff's residual functioning capacity.

## VI. CONCLUSION

For the reasons set forth above, the Court recommends that Plaintiff's Motion for Summary Judgment (ECF No. 25) be DENIED, Defendant's Motion for Summary Judgment (ECF No. 27) be GRANTED, and the final decision of the Commissioner be AFFIRMED.

Let the clerk forward a copy of this Report and Recommendation to United States District Judge Lauck and to all counsel of record.

NOTICE TO PARTIES

**Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within fourteen (14) days after being served with a copy of this report may result in the waiver of any right to a de novo review of the determinations contained in the report and such failure shall bar you from attacking on appeal the findings and conclusions accepted and adopted by the District Judge except upon grounds of plain error.**

                                              /s/ MRC
                                              Mark R. Colombell
                                              United States Magistrate Judge

Richmond, Virginia
Date: October 19, 2021